Filed 7/11/24  P. v. Bernoski CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D081571 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD295810) |
| AMY LYNN BERNOSKI, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, David M. Rubin, Judge.  Reversed.

Belinda Escobosa, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Senior Assistant Attorney General, Collette C. Cavalier and Sahar Karimi, Deputy Attorneys General,  for Plaintiff and Respondent.

Appellant Amy Lynn Bernoski is a military veteran who struggles with her mental health.  After pleading guilty to evading an officer with reckless driving, she was placed on probation with terms and conditions including that she complete a residential treatment program.  Within two weeks of entering the program, she was discharged for allegedly noncompliant and disrespectful behavior, leading to a contested probation revocation proceeding.

Bernoski contends the trial court erred and violated her due process rights to confront and cross-examine adverse witnesses by relying on hearsay evidence—a discharge report prepared by a supervisor at the residential treatment program—in finding that she violated probation by failing to complete the program.  We agree the trial court erred, and cannot find that the error was harmless beyond a reasonable doubt.  We therefore reverse the order revoking probation and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

In August 2022, Bernoski pleaded guilty to evading a police officer with reckless driving.  (Veh. Code, § 2800.2, subd. (a).)  The trial court imposed 16 months in prison, suspended execution of sentence, and granted Bernoski formal probation for two years.  The terms and conditions of probation included that she obey all laws and that she complete a residential treatment program.  Bernoski was released from custody and promptly entered such a program.

Less than two weeks later, the probation department filed a report alleging that Bernoski violated probation by failing to remain law abiding and failing to complete her treatment program.  The petition alleged that she was discharged from her program because she did not follow the rules, threw

2

objects at other residents, and disrespected the staff. It was further alleged that, on the same date, she was arrested for being under the influence and falsely identifying herself to police. Bernoski denied these allegations and exercised her right to an evidentiary hearing.

At the hearing, the prosecution called one witness to testify, a deputy probation officer (PO) who was assigned to Bernoski's case after the alleged violations. When this PO began to testify about speaking with a supervisor at the treatment program, defense counsel objected to considering the contents of the conversation on hearsay grounds. The court then asked the prosecutor to explain why the supervisor was not there to testify. She responded that she had a discharge report from the treatment program. Defense counsel said she never received this report.

After discussing relevant case law with counsel, the court found that the prosecutor failed to show good cause for the supervisor's absence or the untimely disclosure of the report, a "key piece of evidence" against Bernoski. Nevertheless, relying on *People v. O'Connell* (2003) 107 Cal.App.4th 1062 (*O'Connell*), the court admitted the report into evidence but did not allow the PO to testify about its contents.

The discharge report is a three-page document that appears to have been prepared electronically by a supervisor at the residential treatment program. At the top of the report is Bernoski's name, date of birth, and identification number. It lists her admission date as October 5, 2022, and discharge date as October 15, 2022. The report then sets forth a series of form questions that the supervisor answered. As relevant here, in a field labeled, "Description of services received," the supervisor typed: "Unknown. Supv [*sic*] was asked to DC [(discharge)] client after police response after bizarre and potentially dangerous behavior occurred in overnight hours."

3

The "Discharge reason" was "Voluntary" and the "Specific Discharge reason" was described as: "Left before Completion: Unsatisfactory Progress/Administrative." In a subsequent field seeking additional details, the supervisor wrote the following narrative:

> "Ptc [*sic*] [Bernoski] was given a [Notice of Adverse Benefit Determination (NOABD)] term notice on 10-14-22 for bizarre and disruptive behavior. Later that night ptc [*sic*] created a disruption and told staff to 'go home' and asked what their salary was.
>
> "She began ripping down signs around the property and refused to cooperate with staff. EPD was called and chased ptc [*sic*] for a short while, being unable to locate her.
>
> "At abt [*sic*] 0600hrs they called and said they found her throwing rocks at cars and was under the influence. She was booked on a couple of charges and a probation viol. [*sic*] She is not welcome [*sic*] back; NOABD stands[.]"

In the final section soliciting discharge recommendations, the supervisor noted that "Ptc [*sic*] should be treated for high emotional need." The report is electronically signed and dated October 15, 2022.

Although there is no predetermined timeline for successful completion of the residential treatment program—it "all depends on the performance of the probationer"—the PO testified that Bernoski did not complete her program "[b]ecause she was discharged from the program." On cross-examination, referring to notes made by a different probation officer, the PO acknowledged that Bernoski called the probation department about four days before her discharge from the treatment center, inquiring whether she needed to complete that specific program. She was told, if she failed to complete that program, a probation violation would be reported. The testifying PO also acknowledged that Bernoski is a military veteran

4

struggling with PTSD. He did not know whether her treatment program had a mental health clinician or licensed social worker on its staff.

Other than what was incidentally mentioned in the discharge report, the prosecution was unable to produce any admissible evidence that Bernoski failed to obey all laws. Sustaining a hearsay objection, the court did not allow the PO to testify as to what the police officers reported to the probation department. And, as a matter of due process, it also did not permit a police officer to testify about Bernoski's alleged arrest because the prosecution failed to disclose the police report to the defense.

Given the lack of evidence on whether Bernoski failed to remain law abiding, the trial court focused on the allegation that she failed to complete her treatment program. To that point, the court noted that it considered the discharge report and "read the case law which talks about how reports are an acceptable form of hearsay in a revocation hearing." The court then found Bernoski in violation of probation by failing to complete the residential treatment program. It formally revoked probation, but continued sentencing to determine whether there was a "more robust" treatment program available, observing that Bernoski was clearly struggling with mental illness. The court ultimately ordered execution of the 16-month prison term.[1]

## DISCUSSION

Bernoski contends the trial court abused its discretion and violated her due process rights by allowing hearsay evidence—the discharge report—to prove that she willfully failed to complete the residential treatment program.

---

[1]    At the same time, the court sentenced Bernoski to a concurrent term of 16 months on a separate case. She was on probation for that case at the time of the August 2022 offense.

5

We agree. And because we cannot conclude the error was harmless beyond a reasonable doubt, we must reverse the order revoking probation.[2]

"In conducting a probation revocation hearing, a trial court exercises its discretion to 'revoke and terminate the supervision of the person if the interests of justice so require and the court, in its judgment, has reason to believe from the report of the probation . . . officer or otherwise that the person has violated any of the conditions of their supervision, or has subsequently committed other offenses, regardless of whether the person has been prosecuted for those offenses.' (Pen. Code, § 1203.2, subd. (a).) 'The facts supporting a probation revocation must be proved by a preponderance of the evidence.' " (*People v. Gray* (2023) 15 Cal.5th 152, 163 (*Gray*).)

However, a court may not revoke probation unless the evidence establishes that " 'the probationer's conduct constituted a *willful* violation of the terms and conditions of probation.' " (*People v. Cervantes* (2009) 175 Cal.App.4th 291, 295 (*Cervantes*), italics added; accord, *People v. Hall* (2017) 2 Cal.5th 494, 498 ["Revocation of probation typically requires proof that the probation violation was willful"].) "Where a probationer is unable to comply with a probation condition because of circumstances beyond his or her control and defendant's conduct was not contumacious, revoking probation and imposing a prison term are reversible error." (*Cervantes*, at p. 295.)

We review the decision to admit or exclude evidence in a probation revocation hearing for abuse of discretion. (*O'Connell*, *supra*, 107 Cal.App.4th at p. 1066.)

It is well established that probation revocations are not part of a criminal prosecution, "and thus 'the full panoply of rights due a defendant in

[2] Bernoski also contends the trial court abused its discretion by executing the prison term instead of reinstating probation. Because we reverse the order revoking probation, we do not reach this additional claim.

[a criminal] proceeding does not apply.' " (*Gray*, *supra*, 15 Cal.5th at p. 163.)

A defendant in a probation revocation hearing has no Sixth Amendment right to confront witnesses. (*Ibid*.) Nevertheless, the defendant's loss of liberty is at stake. (*Ibid*.) And both parties have an interest in " 'in accurate fact-finding and the informed use of discretion by the trial court' " to ensure that probation is not unjustifiably revoked. (*Ibid*.) Accordingly, defendants retain basic due process rights in probation revocation proceedings, including a "flexible" version of the right to confront and cross-examine adverse witnesses. (*Id*. at p. 164, citing *Gagnon v. Scarpelli* (1973) 411 U.S. 778, 786; *Morrissey v. Brewer* (1972) 408 U.S. 471, 489.) " '[C]onventional substitutes for live testimony' " that would not be admissible in a criminal trial—such as letters, affidavits, depositions, and other documentary evidence—may be admissible in a probation revocation hearing. (*Gray*, at p. 164.)

At a probation revocation hearing, the admissibility of hearsay evidence differs depending on whether it is of a "traditional 'documentary' " nature or testimonial nature. (*People v. Arreola* (1994) 7 Cal.4th 1144, 1157 (*Arreola*).) Examples of traditional documentary evidence include laboratory reports, invoices, receipts, and routine records. (See, e.g., *People v. Maki* (1985) 39 Cal.3d 707, 716–717 (*Maki*) [rental car invoice and hotel receipt]; *People v. Abrams* (2007) 158 Cal.App.4th 396, 398 (*Abrams*) ["whether or not a defendant has reported to his probation officer or made monetary payments to the officer are essentially nontestimonial"]; *People v. Gomez* (2010) 181 Cal.App.4th 1028, 1032–1033 (*Gomez*) [summary of electronic records showing the defendant failed to report; failed to provide verification of work, counseling, and employment; and failed to submit restitution payments].)

The need to confront a witness regarding such evidence is diminished, as a witness is typically called to simply authenticate the document at issue.

7

(*Arreola*, *supra*, 7 Cal.4th at p. 1157; see, e.g., *Abrams*, *supra*, 158 Cal.App.4th at p. 404 [regarding records showing defendant did not call into probation, "[a]dding a computer custodian of records to recount the process of logging in calls . . . would have been of little assistance" and their credibility "was not critical" to decide if defendant violated].) The witness "ordinarily would be unable to recall from actual memory information relating to the specific contents of the writing and would rely instead upon the record of his or her own action." (*Arreola*, p. 1157; see also *People v. Liggins* (2020) 53 Cal.App.5th 55, 66 ["there is no significant utility to a defendant's confrontation right when a document that simply records data is involved" as "a document cannot be cross-examined or its demeanor observed"].)

Traditional documentary hearsay evidence may be admitted at a probation revocation hearing if it bears sufficient indicia of reliability. (*Maki*, *supra*, 39 Cal.3d at p. 709.) For instance, in *Maki*, the defendant allegedly violated probation by traveling out of the county without permission from his probation officer. (*Ibid*.) The Supreme Court held the trial court properly admitted a rental car invoice and hotel receipt as evidence of the violation. (*Id*. at pp. 716–717.) Considered together, the documents were sufficiently reliable because they were seized from the defendant's home; were printed on paper bearing the respective company names; were relevantly dated; and, most significantly, bore the defendant's name and signature. (*Id*. at p. 717.)

Conversely, when hearsay has, "as its source, live testimony" from an adverse witness, "the need for confrontation is particularly important" to give the defense an opportunity to observe the witness's demeanor. (*Arreola*, *supra*, 7 Cal.4th at p. 1157.) A clear example of such evidence would be a preliminary hearing transcript from a related criminal proceeding. (*Ibid*.)

8

However, statements to a probation officer by victims or witnesses can fall on this "side of the line" as well. (*Abrams*, *supra*, 158 Cal.App.4th at p. 405.)

Testimonial hearsay evidence may be admitted when the proponent shows good cause to dispense with the defendant's right of confrontation. (*Arreola*, *supra*, 7 Cal.4th at p. 1159; see also *People v. Shepherd* (2007) 151 Cal.App.4th 1193, 1201, fn. 4 (*Shepherd*) ["the good cause standard recognizes that a third party's unsworn verbal statements are the least reliable type of hearsay, and thus requires a greater showing to support use of such evidence in probation revocation hearings"].) This standard can be satisfied when: (1) the declarant is unavailable under the traditional hearsay standard (see Evid. Code, § 240); (2) the declarant can be brought to the hearing only through great difficulty or expense; or (3) their presence would pose a risk of harm (including mental or emotional harm). (*Arreola*, at pp. 1159–1160.) The showing of good cause must be considered with other relevant circumstances, "including the purpose for which the evidence is offered (e.g., as substantive evidence of an alleged probation violation, rather than, for example, simply a reference to the defendant's character); the significance of the particular evidence to a factual determination relevant to a finding of violation of probation; and whether other admissible evidence, including, for example, any admissions made by the probationer, corroborates the former testimony, or whether, instead, the former testimony constitutes the sole evidence establishing a violation of probation." (*Id*. at p. 1160.)

In this case, by referencing *O'Connell*, *supra*, 107 Cal.App.4th 1062, it appears the trial court considered the discharge report to be traditional documentary evidence. In *O'Connell*, the defendant was placed on probation on the condition that he participate in the deferred entry of judgment program, which in turn required that he attend drug counseling sessions.

9

His probation officer later filed a report seeking his termination from the deferred entry of judgment program. To this report, the probation officer attached an "Adult Drug Program Termination Report" prepared by the manager of the drug counseling program. This single-page report said the defendant was terminated from the program due to excessive absences. He completed "0 of 20" sessions. (*Id*. at pp. 1064, 1066.) At a hearing on the violation, the trial court admitted the termination report over the defense's hearsay objection. (*Id*. at pp. 1064–1065.) The Court of Appeal affirmed, opining the report was "akin to the documentary evidence that traditionally has been admissible at probation revocation proceedings." (*Id*. at p. 1066.)

As the *O'Connell* court reasoned, the termination report "was prepared contemporaneously to, and specifically for," the probation revocation hearing and, as the trial court expressly noted, "such reports were routinely received without undertaking the added burden of calling the author to authenticate it because the reports were prepared in response to a referral from the court." (*O'Connell*, *supra*, 107 Cal.App.4th at p. 1067.) Since the report was routine, the appellate court saw no reason to doubt its reliability. (*Id*. at pp. 1065, 1067.) Moreover, the appellate court opined that any error in admitting the report was harmless since the defendant admitted he did not attend drug counseling due to financial and transportation difficulties. (*Id*. at p. 1067.)

In our view, however, the discharge report in this case is appreciably different from the termination report in *O'Connell*. There is no indication in the record that the discharge report was a routine report that the residential treatment program produced for the trial court. It was not addressed to the court or the probation department. And the discharge report does not merely calculate how many how many days Bernoski attended the program, with a certain number of days equaling successful completion of the program.

10

As the probation officer testified, successful completion was a moving target "depend[ing] on the performance of the probationer." Really, the discharge report is a narrative describing the circumstances underlying the subjective decision to terminate Bernoski from the program. For these reasons, we find the discharge report more akin to the hearsay evidence discussed in *In re Kentron D.* (2002) 101 Cal.App.4th 1381 (*Kentron*) and *People v. Shepherd* (2007) 151 Cal.App.4th 1193 (*Shepherd*).

In *Kentron*, the minor was placed in a camp program under certain conditions, "including that he obey all laws and orders of the probation officer and of the court, obey all instructions and orders of his parents, probation officer and camp staff, and not participate in any type of gang activity." (101 Cal.App.4th at p. 1384.) The probation department filed a report describing five separate instances where the minor violated these conditions by arguing with other camp wards; threatening and disrespecting probation officers; and issuing a gang challenge toward another ward. (*Id.* at pp. 1384–1386.) At a violation hearing, the prosecution submitted on the report. (*Id.* at p. 1387.) The Court of Appeal held the trial court abused its discretion and denied the minor due process by admitting the report. (*Id.* at pp. 1387, 1392.) It was "a substitute for live testimony describing the acts" constituting the alleged violations, yet the prosecution failed to show the involved officers were unavailable and there was no finding of good cause. (*Id.* at pp. 1391–1393.) Allowing the prosecution to submit on the report denied the minor and the court "the opportunity to observe the demeanor of [the minor's] accusers, one of the essential components of the right of confrontation." (*Id.* at p. 1393.)

Even more relevant here, in *Shepherd*, the defendant was participating in a residential treatment program when it was alleged that he violated

11

probation by consuming alcohol. (151 Cal.App.4th at p. 1196.) At a contested probation violation hearing, a probation officer testified that he spoke with an employee at the treatment program who said that the defendant was ordered to leave the program after he "smelled of, and tested positive for, alcohol consumption." (*Id.* at p. 1197.) The Court of Appeal held the trial court erred in admitting this testimony, as it was a form of testimonial hearsay and the prosecution offered no reason for the employee's absence, never suggested she was unavailable, and never claimed "her live testimony could be obtained only at great inconvenience." (*Id.* at pp. 1201–1202.) As no other evidence corroborated the assertion that the defendant drank alcohol—and in fact, it was not even clear whether the employee personally observed the drinking or "was simply reporting what she had been told by other, unidentified, persons at the program"—the appellate court reversed. (*Id.* at pp. 1202–1203.)

Similar to *Kentron* and *Shepherd*, the report in this case recounts behaviors by Bernoski that triggered her discharge from the treatment program. It asserts that she engaged in "bizarre" and "disruptive" or "potentially dangerous behavior." In particular, she allegedly told staff to go home, asked what their salary was, refused to cooperate, and ripped down some signs. According to the report, the treatment center then called the police, causing Bernoski to flee, but she was found and arrested the next morning. This discussion is materially distinct from an auto-generated or routine report that must simply be authenticated. (Cf. *Abrams, supra,* 158 Cal.App.4th at p. 404 [regarding report stating that the defendant failed to report to probation, the testimony of a probation officer "likely would not have added anything to the truth-furthering process, because he would be testifying to a negative: that defendant did not make any appointments and that [the officer] had not spoken to defendant"].) Rather, it is a substitute for

12

the live testimony of the treatment center employee(s) who observed Bernoski that night.

Indeed, as in *Shepherd*, it is not even clear that the supervisor who prepared the discharge report personally observed the described behaviors. In fact, it seems the supervisor was unfamiliar with Bernoski since she wrote that her "[p]resenting conditions" and "[s]ervices received" were "unknown" and that she "was asked to" discharge her. Moreover, the discharge report is somewhat conflicting and unclear. In certain parts, it suggests she was discharged because she voluntarily left, but elsewhere, it states she was given a "termination notice" and was "not welcome[d] back" to the program.

Although the report states that Bernoski told staff to go home, asked about their salary, was uncooperative, and tore down some signs, without any evidence of the treatment program's standards, policies, or procedures, it is not clear why this warranted immediate termination rather than intermediate sanctions and/or a revision of her treatment plan. And given the evidence that Bernoski struggles with extensive mental health issues, it would be important to know whether she exhibited signs of a mental health episode on the evening in question in assessing whether her failure to complete the treatment program was willful. The live testimony of the involved employee(s) would have clarified the report on these points, and given Bernoski an opportunity to observe and cross-examine her accusers. (Cf. *Gomez, supra*, 181 Cal.App.4th 1028, 1038–1039 [no error where the probation officers' "demeanor while testifying would not have been helpful in determining the truth of the facts they reported" and cross-examination was not "likely to elicit any facts pertinent to the inquiry facing the trial court"].)

We thus conclude that the discharge report is more fairly categorized as a form of testimonial hearsay. Accordingly, it should not have been admitted into evidence absent a showing of good cause. (*Arreola, supra*, 7 Cal.4th at p. 1159.) Because the prosecution made no showing that the supervisor and/or any other appropriate witness from the treatment program were unavailable to testify, and the trial court specifically found the prosecution failed to establish good cause for their absence, the court erred by admitting the discharge report into evidence.

The ultimate question is whether the erroneous admission of the discharge report prejudiced Bernoski. "Because such error is of federal constitutional dimension, we must assess prejudice under the 'harmless-beyond-a-reasonable-doubt' standard." (*Arreola, supra*, 7 Cal.4th at p. 1161; see also *Chapman v. California* (1967) 386 U.S. 18, 24 ["before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"].) On the record of this particular case, we cannot say that the error was harmless.

The trial court described the discharge report as a "key piece of evidence" against Bernoski and expressly relied on the report in finding that she failed to complete the treatment program. Besides the report, the only other evidence presented at the revocation hearing was the testimony of the PO. Since he was not permitted to describe the contents of the report or recount his conversation with the supervisor at the treatment program, he contributed limited evidence. He confirmed that Bernoski was a veteran struggling with PTSD, but was unsure whether the treatment program had a mental health clinician or licensed social worker on staff that was able to meet Bernoski's needs. He testified that, a few days before her discharge from the program, two officers advised Bernoski that she needed to complete

14

that specific program or they would report a probation violation. He opined that she did not complete her program, while acknowledging there is no set time period that constitutes successful competition of the program. We are not convinced beyond a reasonable doubt that the trial court would have revoked Bernoski's probation based on this testimony alone.

Although the PO testified that Bernoski did not complete the treatment program, he lacked personal knowledge of the events leading up to her discharge from the program, as he was assigned to her case only after the alleged violations. More importantly, as Bernoski argues, it is not enough that she did not complete the program. The trial court needed to find that she *willfully* failed to do so. (*Cervantes*, *supra*, 175 Cal.App.4th at p. 295.)

Despite the evidence that Bernoski was reminded that she had to complete this specific program or else she could violate probation, we question whether the trial court would have found she *willfully* failed to complete the program absent the discharge report. Again, there was no other admitted evidence describing the events or reasons resulting in her termination. Moreover, successful completion of the program appears based, at least in part, on a subjective evaluation of her performance; the record shows that she struggles with her mental health; and it is not clear that this program was ever equipped to meet her mental health needs. Indeed, the supervisor noted that Bernoski "should be treated for high emotional need" and the trial court apparently realized that the program was insufficiently "robust." In other words, as defense counsel argued at sentencing, it appears Bernoski was placed "in a position where she was not going to succeed."

Finally, because the prosecution was unable to produce admissible evidence proving that Bernoski failed to obey all laws, there were not independent grounds to justify revoking her probation. (Cf. *Arreola*, *supra*,

15

7 Cal.4th at p. 1161 [erroneous admission of preliminary hearing transcript was harmless where other evidence was received "establishing that defendant had violated his probation in several respects" and, after the revocation proceedings, he was convicted of the offense underlying the probation violation allegations].)[3]  For all these reasons, we cannot deem the improper admission of the report harmless beyond a reasonable doubt.

---

[3]     A supplemental probation report prepared after the trial court revoked probation states that criminal charges following Bernoski's arrest were dismissed.  To the extent the Attorney General suggested at oral argument that this report also included a statement from Bernoski amounting to an admission of the violation, rendering any error harmless, we deem the point forfeited.  (See *Sunset Drive Corp. v. City of Redlands* (1999) 73 Cal.App.4th 215, 226 [absent a sufficient showing of justification, we will generally decline to consider an argument raised for the first time at oral argument].)  In any event, it is not clear that the statement in question—she "simply admitted she failed to comply with program conduct expectations by exhibiting disruptive behavior, thus resulting in her discharge"—can be used against her as an admission that she willfully failed to complete the treatment program.  Indeed, the statement can be fairly read as mere recognition of what the trial court had already found true.

16

## DISPOSITION

The judgment is reversed. The matter is remanded to the trial court for further proceedings consistent with this opinion.[4]

DATO, Acting P. J.

WE CONCUR:

KELETY, J.

CASTILLO, J.

---

[4] On the eve of oral argument in June 2024, the Attorney General filed a motion to dismiss this appeal under the fugitive disentitlement doctrine. (See *People v. Puluc-Sique* (2010) 182 Cal.App.4th 894, 897 ["disentitlement based on fugitive status is not a jurisdictional doctrine, but a discretionary tool that may be applied when the balance of the equitable concerns make it a proper sanction for a party's flight"].) According to records submitted with the motion, Bernoski was released from prison to postrelease community supervision in April 2023. She stopped reporting to probation in August, and a bench warrant for her arrest was issued in September. The Attorney General represents that Bernoski remains at large. Nevertheless, because the circumstances underlying her failure to report are unclear and may well be complicated by her mental health challenges, we choose to exercise our discretion in declining to dismiss the appeal. (See *id.* at p. 900 ["failing to comply with a reporting requirement imposed as a condition of probation does not trigger the appellate disentitlement doctrine unless there is also evidence the defendant has 'fled or hidden from the jurisdiction of the court' "].)